**TRANSCRIBED FROM DIGITAL RECORDING**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ADAM KELLEY, ) Docket No. 13 CV 4922
)
Plaintiff, )
) Chicago, Illinois
vs. ) May 7, 2015
) 11:07 o'clock a.m.
SPIRO LEMPESIS, et al., )
)
Defendants. )

TRANSCRIPT OF PROCEEDINGS - Status
BEFORE MAGISTRATE JUDGE YOUNG B. KIM

APPEARANCES:

For the Plaintiff: McNABOLA LAW GROUP
BY: MS. KAREN McNULTY ENRIGHT
55 West Wacker Drive
Suite 950
Chicago, Illinois 60601

For Spiro Lempesis: LEWIS BRISBOIS BISGAARD & SMITH LLP
BY: MR. TIMOTHY J. YOUNG
550 West Adams Street
Suite 300
Chicago, Illinois 60661

For Community Consolidated School District 180:
ANCEL GLINK DIAMOND BUSH DiCIANNI & KRAFTHEFER PC
BY: MS. DARCY L. PROCTOR
140 South Dearborn Street
Suite 600
Chicago, Illinois 60603

Laura LaCien, CSR, RMR, CRR
Official Court Reporter
219 South Dearborn Street, Suite 1902
Chicago, Illinois 60604
(312) 408-5032

****PLEASE NOTIFY OF CORRECT SPEAKER IDENTIFICATION****
**NOTE: FAILURE TO STAND NEAR THE MICROPHONE MAKES PORTIONS UNINTELLIGIBLE AND INAUDIBLE.**

(The following digitally recorded proceedings were had in open court:)

COURTROOM DEPUTY: 13 C 4922, Kelley versus Lempesis, et al.

MS. ENRIGHT: Good morning, your Honor. Karen Enright on behalf of the plaintiff.

MS. PROCTOR: Darcy Proctor on behalf of the defendant School District 180.

MR. YOUNG: Timothy Young on behalf of defendant Spiro Lempesis.

THE COURT: To you and to the rest of the attorneys in the courtroom, I apologize for the delayed start.

In this particular case, we have two motions up, correct?

MS. ENRIGHT: Correct.

MS. PROCTOR: Correct.

THE COURT: So let me deal with the first motion and that is Document Number 92, motion to compel. I looked at the motion. I also reviewed the response. I have one question for the school district and my question pertains to the third document on the privileged log that's described as Confidential Draft Letter from Dr. Tamblyn addressed to Lempesis. Do you see that?

MS. PROCTOR: I do see it; yes. I am clear on what you're referring to.

THE COURT: So Confidential Draft Letter from Dr. Tamblyn to Spiro Lempesis.

MS. PROCTOR: I'd like to clarify that unless the Court has --

THE COURT: Yes. That's -- I'm looking for a little more clarification.

MS. PROCTOR: It's a -- It is a confidential letter drafted by attorney Philip Gerner who was the school district's legal counsel.

THE COURT: Okay. How is that different than -- so this is a draft letter sent from the attorney to Dr. Tamblyn.

MS. PROCTOR: That is correct.

THE COURT: Okay. And do we have a copy of the final letter that was, in fact, sent to Lempesis assuming that one was sent?

MS. PROCTOR: With that assumption, the answer to that question is no.

THE COURT: So the letter was never sent?

MS. PROCTOR: No. Let me back up. I want to be sure our negatives are correct here for the record.

Assuming such a letter was sent to Mr. Lempesis, the final draft of the letter was never found by the school district and that's why we submitted the affidavit by the current superintendent indicating he had searched all records

in the District's possession, namely Mr. Lempesis' personnel file and they did not find a copy of any such letter in the personnel file.

THE COURT: That letter dealt with a complaint letter sent to the school district, no? Isn't that what we discussed?

MS. PROCTOR: No. I don't think that's correct. I don't think there's any evidence that there was ever a complaint letter sent to the school district.

THE COURT: But you don't know whether a letter was, in fact, sent?

MS. PROCTOR: What letter are you referring to, your Honor?

THE COURT: Dr. Tamblyn's letter.

MS. PROCTOR: I think -- you know, I will tell you, Dr. Tamblyn has not given a deposition yet in the case but, you know, certainly plaintiff is, you know, free to question him about whether or not such a letter was sent, what his memory of that letter is.

THE COURT: So the answer is no, we don't know. Why are you being so cautious here? Either you don't -- you do or you don't know.

MS. PROCTOR: Well --

THE COURT: I'm just trying to get a sense as --

MS. PROCTOR: Yes. I'm being cautious because we've

raised attorney/client privilege to these documents so my under -- you know, I believe if you -- if you -- you know, without forecasting what Dr. Tamblyn's testimony was going to be and he is -- he was the superintendent, you know, for the years in question -- again, this is going back to 1995, 1996 school year -- I believe Dr. Tamblyn's testimony will be that a letter was sent to Mr. Lempesis.

THE COURT: Okay. And Mr. Gerner does not have the final draft?

MS. PROCTOR: He does not; nor does the school district.

THE COURT: Okay.

MS. PROCTOR: So I'm trying to be clear very and accurate in my responses to your Honor's questions based on the information known to me at this time.

THE COURT: All right. With respect to the motion to compel, I'm going to deny it without prejudice. I do want more information from Dr. Tamblyn as to what --

Is it a he?

MS. PROCTOR: He, yes. Terry Tamblyn.

THE COURT: -- he is going to say regarding this letter if, in fact, he recalls that after the communication between the attorney a letter was, in fact, sent to Mr. Lempesis. I do think there is some merit to the argument that there is no alternative way of figuring out what the

letter said without actually going to the actual communication between the attorney and Dr. Tamblyn and I do need to consider that argument from the plaintiff at that point but I just need a little bit more information.

MS. ENRIGHT: Can I just state something for the record?

THE COURT: Yes.

MS. ENRIGHT: Dr. Tamblyn is her client so --

THE COURT: No. It's --

MS. ENRIGHT: Dr. Tamblyn was --

THE COURT: The defendant here is Lempesis and the school district.

MS. ENRIGHT: Right, and Dr. Tamblyn --

THE COURT: She may be an employee --

MS. ENRIGHT: Right.

THE COURT: -- or a former employee.

MS. ENRIGHT: Right. And she's going to be represented by the school district.

THE COURT: Okay. So we'll get more information from the deposition, right?

MS. ENRIGHT: Okay. In addition, there have been two privileged logs that have been submitted in this case and neither one of them states that this letter was -- had anything to do with any attorney. It says from Dr. Tamblyn to Spiro Lempesis. And that's my objection is that this

isn't attorney/client privilege if it's from Dr. Tamblyn to Spiro Lempesis. Both privileged logs state that.

THE COURT: That's what I was trying to clarify today. With respect to the third letter, it made it sound like this was a letter that was sent to Mr. Lempesis. But that's not the case. This is, in fact, a draft that the attorney and Dr. Tamblyn were, in fact, considering in going back and forth. So the motion to compel is denied without prejudice.

With respect to the motion to -- motion under Rule 35 for independent medical examination, I'll allow you to respond or reply, I should say.

MS. PROCTOR: Yeah. And thank you, your Honor. I -- it would have been my preference to file a written reply but I was -- I needed to have a conversation with Dr. Alan Friedman who is the clinical psychologist who we have retained to do the psychological testing. I received an e-mail from him. Actually, it didn't come through my e-mail last evening. I actually received it via fax this morning and it sets forth the protocol that would be involved in the psychological testing of Mr. Kelley and, you know, that was again shared with plaintiff and defense counsel.

But if I could just back up for a moment, your Honor, just to refresh the Court's memory and so the record is clear, I mean, we have a -- we have a plaintiff who is now

in his 30s who claims he was sexually abused when he was in middle school when he was -- it began when he was in middle school when he was a student at School District 180.

Just shy of the 20-year statute of limitations that was going to run in the case, plaintiff's memory of the sexual abuse going back to 1995, '96, continuing into '97 and '98, his memory came back so we're dealing with a repressed memory case. And in addition --

THE COURT: Can I stop you --

MS. PROCTOR: Yes.

THE COURT: -- and just ask for a clarification? When you say just shy of the statute of limitations, what are you suggesting --

MS. PROCTOR: Well, let --

THE COURT: -- that we have a statute of limitations problem or we don't?

MS. PROCTOR: I don't know the -- I do not know the answer to that at this time, your Honor. But my point is, is we have almost -- you know, I think it was maybe an 18-year gap between, you know, the first memories of abuse and what's at issue in the case. I just wanted to -- my reason for getting into it is I just wanted the Judge to be clear that we're dealing with -- you know, this is somewhat of a unique case. It's going back and recalling events 20 years prior. It's a repressed memory claim, all right, and we did take the

deposition of the plaintiff's primary psychologist who will give the opinion -- and these are damages and injuries and harm that are being claimed in the case -- that Mr. Kelley is suffering from, you know, past, present and future severe emotional distress and that he has been diagnosed with mental disorders known as post-traumatic stress syndrome as well as major depression chronic so that's kind of the background on the case, the nature of the claims, the nature of the injuries.

It's the defendant's position -- and it is a joint motion -- that the two requirements under Rule 35 have been satisfied here. First, without question, the plaintiff's mental status and emotional condition, well-being status is clearly in controversy.

The other prong under 35 is to show that there is good cause. And when the plaintiff is going to claim past, present and future emotional distress and harm for which he is seeking recovery for due to the alleged acts of the defendants, that under those circumstances, the case law is clear that the good cause requirement is satisfied.

In reading plaintiff's motion --

THE COURT: Plaintiff's response?

MS. PROCTOR: Yeah. In reading plaintiff's response in opposition to the Rule 35 motion, I think they argue that -- you know, there really is -- there is no reason, you

know, for the defense to be able to explore the nature and extent of the plaintiff's claimed damages in this case. We don't think that that is consistent with the federal case law in this area which clearly gives the defendants a right to explore, you know, with their own scientific evidence to challenge the plaintiff's claims of emotional damages. It's -- Rule 35 essentially allows a leveling of the playing field among the parties. And, you know, while Mr. Kelley -- you know, the allegations do involve allegations of purported sexual abuse, there is case law out there in sexual abuse cases where Rule 35 examinations are allowed.

So we propose to have Dr. Louis Kraus who is a forensic psychiatrist board certified -- he's associated with Rush Medical Center --

THE COURT: Now you're just repeating what's in your motion.

MS. PROCTOR: Yeah; I know. But I want to be clear on what we're asking for unless, you know, you would rather not.

THE COURT: No. I just want to hear any counter-points to plaintiff's response.

MS. PROCTOR: Right; and -- well, in the case -- and the case is law is basically you can just -- basically, the plaintiff's primary argument is well you should just be able to rely on what the plaintiff and what his treating

therapists say. And, you know, the case in particular I'm referencing is Nuskey, N-u-s-k-e-y, versus Lambright, L-a-m-b-r-i-g-h-t. It's at 251 Federal Rule Decision 3 where the defense -- where the plaintiffs made that very argument, you know, why under Rule 35 the defense wouldn't be entitled to it and the language in that case -- and I'll read it because I think it's -- I think it's --

THE COURT: That's not necessary.

MS. PROCTOR: Okay. Well, basically to deny the defense the right to do the IME in the way that we have proposed -- and I can respond a little bit more specifically as to what would likely be involved based on the information known to me in my consultation with Dr. Friedman, the clinical psychologist -- we would be deprived of our defense of the plaintiff's damages claims --

THE COURT: All right.

MS. PROCTOR: -- in the event the Rule 35 examination was not allowed; so thank you.

THE COURT: I agree with the defendant's position on this particular examination. I don't -- I'm not persuaded by the argument, Ms. Enright, that this is going to reopen very deep wounds and it's going to traumatize Mr. Kelley and he has to re-live the nightmares. The fact is he brought the case. And to a certain extent, I'm sure he recognized that when he files his lawsuit, that he's going to have to re-live

many of the events that occurred.

So I recognize and I appreciate the risk that he has taken and I do appreciate what he has to go through but the fact is, Mr. Kelley has his own version of what happened and his treating physicians are not going to be always trying to dispute what Mr. Kelley says and their job is to treat Mr. Kelley. Their job isn't to, in fact, evaluate whether Mr. Kelley is perhaps even telling the truth. I don't know. But I think it's fair to say that most treating physicians take a deterministic approach. They're not going to doubt what Mr. Kelley is saying because their purpose is to treat the patient.

But at the same time when we're here in litigation, defendants have the right to test the veracity of Mr. Kelley's testimony, they have the right to go ahead and test on their own whether in fact Mr. Kelley is suffering from these disorders and traumas and whatnot. So for those reasons, I am inclined to grant the motion but I do want to give you an opportunity to respond to my comments.

MS. ENRIGHT: Thank you, your Honor. Because my response was two-fold. Number one, you just addressed. The second part is the Rule requires a set protocol. This is 11 hours of testing that they're proposing. It's -- it's -- I have no idea what they're going to be doing. They sent an e-mail this morning saying he could be tested on any one of

30 tests.

So I would like, according to the rule, a protocol what tests are going to be administered, the purpose of the tests and I want to make sure -- because there are certain tests that should not, according to the testing protocols, be repeated on a patient within one year and I'm sure their psychologist already knows that so I want to make sure what tests they are going to be administering.

THE COURT: Are there problems with the time frame?

MS. ENRIGHT: Yes. The two days that they're proposing -- he's a teacher; he lives in Orland -- those are his last two days of class.

THE COURT: And are they -- Okay. So let me do this: The motion is granted but I am requiring the defendants to provide me with a draft order with the specifics. The rule is sort of vague as to whether the motion has to specify it or whether the order has to specify this specific protocol, dates, times, et cetera, et cetera. So I want the draft order to be shared with the plaintiffs so that the plaintiff has an opportunity to take a look and see what, in fact, is going to be performed and then work with each other regarding the date of the -- dates of the examinations.

MS. PROCTOR: All right. Well, let me -- I would just like to share this with the Court because I don't want

this to be in dispute if we're trying to work out an agreed order. According to the clinical psychologist, this is what he does. The tests that could be administered are generally accepted in the professions of neuropsychology and clinical psychology. They're non-invasive and present in an oral, written or computer-based format.

This is important. Depending upon the information obtained during the clinical interview of Mr. Kelley and the client presentation and his current complaints, a selection of tests from a list of, you know, possible 30 tests -- but I will address them below -- will be presented over the course of the day.

So it's like going to see a physician, you don't really know what's tests are going to be appropriate until you have an opportunity to evaluate and examine the patient. He lists these 30 universe of tests in the psychological world. What he has represented to me -- and it's in our motion -- is that he would need to do a short interview of Mr. Kelley to make that assessment on what tests would be necessary; and then following that, he would administer -- and these are self-administered tests that Mr. Kelley would be asked to complete. He's a college-educated person. He's intelligent.

With that information in mind, he should be able to complete the tests and the clinical interview in up to six

hours. And my reason for getting into this is I don't think our clinical psychologists, you know, that really the Court -- and there's case law on this -- should really dictate or even plaintiff's counsel dictate what tests would be appropriate because that is not known until he has an opportunity to interview and make that assessment of the patient so, I mean, it will be a handful.

THE COURT: But it's not unreasonable --

MS. PROCTOR: Yes.

THE COURT: It's not unreasonable for Ms. Enright to ask for the procedure that the physicians are going to take during the examination so let's go ahead and get those steps down. If, in fact, a physician is going to say in his protocol depending on what happens during examination, the following steps may take place, fine. At least we have some preview as to what's going to happen. And if, in fact, these procedures are routine, standard, we shouldn't have too many problems, right?

So I would like for the defendants to go ahead and provide a draft order to Ms. Enright. Can you do that by May 14th?

MS. PROCTOR: Yes. But I will say that if Mr. Kelley is not available, then that puts us into June and we have a current --

THE COURT: We'll work it out.

MS. PROCTOR: Yeah, a discovery cutoff.

THE COURT: We'll work it out.

MS. PROCTOR: Okay.

THE COURT: But in the meantime, you can work out the dates, right?

MS. PROCTOR: Yes.

THE COURT: So even though the draft order is under -- in progress, you can still work out the dates so that that's confirmed.

MS. PROCTOR: Yeah. I'd like to notify both these doctors so that they can reserve dates but we'll get it worked out.

THE COURT: And can you come back on May 20th at 10:30 -- I'm sorry, 11:00 o'clock?

MS. PROCTOR: We may be out of town dep-ing in this case.

THE COURT: Okay.

MS. PROCTOR: We're going to three different states, New Orleans, Florida and North Carolina.

MR. YOUNG: And Idaho.

MS. PROCTOR: And Idaho; four.

THE COURT: If not May 20th, May 22nd.

MR. YOUNG: I think we're clear on May 20th.

MS. PROCTOR: Yeah. It looks as though we're open on the 20th.

MS. ENRIGHT: I think May 20th looks good.

THE COURT: May 20th.

MS. ENRIGHT: Can I just ask one other thing?

THE COURT: Yes.

MS. ENRIGHT: If the doctors are going to be re-doing any of Adam Kelley's records in advance, there was a deposition of one of his treaters, that's under seal, so I'm assuming that that deposition will not be shared with anyone because there's a protective order.

MS. PROCTOR: Well, if you look at the protective order, it allows for experts for any of the parties to redo it so --

THE COURT: Okay. I need you to work out these issues on your own.

MS. ENRIGHT: Okay. All right. So May.

MS. PROCTOR: That's my understanding.

THE COURT: All right. So May 20th at 11:00 o'clock. We'll go ahead and revisit the draft order, make sure that we don't have any problems.

I also want to share with you one other -- actually, there are two items I still have to share -- cover. One, with respect to that draft letter that we talked about, if it turns out that I later on say that particular letter has to be disclosed, I am going to allow the plaintiff to re-depose Dr. Tamblyn so I'll leave that out there for you to consider.

Now this letter, I understand that it was a back-and-forth process with the attorney for the school district. But in the end, the purpose of the letter is to in fact release to them if they're a party. So I'll just share that with you in your decision-making process, is it worth it for us to just go ahead and just give the letter to Ms. Enright so that it's available during the deposition but I'll let you consider that, okay. The motion itself is denied without prejudice.

All I'm saying is if the issue is revisited and I do allow the motion to compel, then Dr. Tamblyn may have to be re-deposed. Okay?

MS. PROCTOR: Can I just -- May I just take one moment and confer with my co-defense counsel because we might be able to address it?

(Brief pause.)

MS. PROCTOR: All right. Very well. Thank you, your Honor.

THE COURT: One final point. I'm not really sure why the exhibits to the motion to compel are filed under seal. I don't know why the responses are filed under seal and I don't know why the motion to -- motion for independent examination is filed under seal.

MS. PROCTOR: I can respond to that. I'll let plaintiff address her own motion. Because we were disclosing

mental health information concerning Mr. Kelley in a public document, including mental diagnosis and testimony of his treating physicians, I didn't feel it was appropriate to have that in the public record so I made the decision based on that to file the Rule 35 motion under seal if that's not --

THE COURT: Isn't that going to come out in this case? I mean, so under --

MS. PROCTOR: I wanted to err on the side of caution.

THE COURT: But under Local Rule 26.2, you have to explain to me why you're filing things under seal. I didn't get that motion. You didn't file a motion with contemporaneously filing stuff under seal.

Ms. Enright, how about your motion? You know, this particular Exhibit 1 to their motion to compel, certain excerpts from the deposition transcript, this is already public record just so you know. Right?

MS. ENRIGHT: Well, no.

THE COURT: It's Document 82-3. It's already filed as a public record, as public document.

MS. PROCTOR: Well, if it is, then it's in error and in violation of the protective order.

THE COURT: Right. So here's what we'll do: I'll keep things under seal for now. I need you to address this issue at the next court date, May 20th at 11:00. Some

exhibits are really not appropriate to be filed under seal such as my order, I mean, privilege log; no. Those aren't confidential privileged information that should be filed -- that can be filed under seal.

MS. PROCTOR: If I could just respond under the agreed, you know, confidentiality and protective order in place, the parties have a right under that order to designate discovery items, deposition testimony in particular as well as other, you know, focusing on the deposition testimony to designate that as a confidential matter. And once that's done, then -- but I think what the Court is saying, we need to file a specific motion under Local Rule 26 so we've all learned something that the reason why something is being filed as a restricted document rather than just do it. Okay.

THE COURT: So review 26.2.

MS. PROCTOR: Will do.

THE COURT: And also review the confidential order that I issued. It does address that particular issue so we'll take it up again since I don't want to take up the entire morning.

MS. PROCTOR: Thank you, your Honor.

THE COURT: Thank you.

MS. PROCTOR: We appreciate your time and attention. Thank you.

MS. ENRIGHT: Thank you.

(Which concluded the proceedings in the above-entitled matter.)

C E R T I F I C A T E

I hereby certify that the foregoing is a transcription of proceedings transcribed from digital proceedings held before the Honorable Young B. Kim on May 7, 2015.

***/s/Laura LaCien***

____________________________ May 8, 2015
Laura LaCien Date
Official Court Reporter